State v. Hann. & St. Jos. R. R. Co.

STATE OF MISSOURI, Appellant, *vs.* THE HANNIBAL & ST. JO-
SEPH RAILROAD COMPANY, Respondent.

1. *Revenue, railroad—Hann. & St. Jo. R. R.—Sworn statement of president,
   assessment on basis of—Act of 1852 providing such basis of taxation not a con-
   tract with State—Assessment by Board of Equalization constitutional.*—Under § 3
   of the act of Sept. 20th, 1852, it became the duty of the president of the Han-
   nibal & St. Joseph R. R. Co. to furnish an annual statement under oath to the
   State auditor, showing the actual value of the railroad property, from which state-
   ment that officer shall assess the railroad State tax: *Held* that this provision
   did not amount to a contract between the State and company which rendered
   invalid the act of March 10th, 1871, (Sess. Acts 1871, p. 56,) subjecting the
   road to assessment for taxation by a special board of equalization; and the
   latter act, so far as inconsistent with the former, repealed it.

### *Appeal from Buchanan Circuit Court.*

*J. A. Hockaday, Atty: Genl.,* for Appellant.

I. The provisions of section three of the act of September,
1852, providing for the payment of a tax by the Hannibal &
St. Joe. R. R. Company and for the mode of assessment, con-
stituted no such vested right in the company as to preclude
the legislature from providing some other mode of assess-
ment.

II. The act of March 10, 1871 (Sess. Acts, 1871, p. 56) pro-
viding for assessment and equalization of taxes of all the
railroads in the State by a special board, composed of the
auditor, treasurer and register of lands, repeals or invalidates
that part of the act of Sept. 20th, 1852, which provides for
the valuation of the property of respondent, by the president
of the Hann. & St. Joe. R. R. Co. (Bailey vs. The Pac. R.
R., decided by the U. S. Sup. Ct. in March, 1875, not yet re-
ported.)

*James Carr,* for Respondent.

I. The original charter of the respondent, by which the
stock, and through it the property of respondent, "is exempt
from all State and county taxes," is a contract, valid and bind-
ing between the appellant on one side and the respondent on
the other. (Binghampton Bridge, 3 Wend., p. 74; Dart-

mouth College vs. Woodward, 4 Wheat., 519; State Bank of Ohio vs. Knott, 16 How., 369; Jefferson Branch Bank vs. Skelly, 1 Black, 436.)

There was and is valuable and sufficient consideration for this exemption from all State and county taxes. The respondent's railroad is the pioneer railroad in the State. "This State and the United State shall have the right in time of war to use said road in transportation of troops or munitions of war, in preference to all other persons." (§ 19, p. 9 of charter.) There was no railroad in this State at the time of granting said exemption. The building of the Hann. & St. Joe. R. R. has added hundreds of millions of dollars to the taxable property of the State, and in this way has more than re-paid the State tenfold for the exemption. (See State Bank of Ohio vs. Knott, 16 How., 369; Dodge vs. Woolsey, 18 Ohio, 331; Jefferson Branch Bank vs. Skelly, 1 Black, 436.)

If there were any other consideration necessary for this exemption from all State and county taxes, it is contained in the act of congress entitled "an act granting the right of way to the State of Missouri and a portion of the public lands to aid in the construction of certain railroads in said State" approved June 10th, 1852, as follows: "That there be and is hereby granted to the State of Missouri for the purpose of aiding in making the railroads aforesaid, every alternate section of land designated by even numbers for six sections in width on each side of said road. * * * * Provided that the lands hereby granted shall be exclusively applied in the construction of that road for which it was granted and selected, and shall be disposed of only as the work progresses, and the same shall be applied to no other purpose whatsoever." (§§ 1, 2, p. 14 of charter.) "And the said railroads shall be and remain public highways for the use of the Government of the United States, free from toll or other charge upon the transportation of any property or troops of the United States." (§ 4, *Id.*) "That the United States mail shall at all times be transported on said railroads under the direction of the post-office department at such price as congress may by law direct." (§ 6 *Id.*; State Bank of

Ohio vs. Knott, 16 How., 369 ; Dodge vs. Woolsey, 18 Ohio, 331 ; Jefferson Branch Bank vs. Skelly, 1 Black, 436 ; Home of the Friendless vs. Rowse, 8 Wal., 430 ; Washington University vs. Rowse, *Id.*, 439 : Wilmington R. R. Co. vs. Reid, 13 Wal., 264 ; Gordon vs. Appeal Tax Court, 3 How., 133 ; McGee vs. Mathis, 4 Wal., 142.)

II. Even if there was no contract by virtue of the act of 1852 exempting the respondent from all State and county taxes or modifying the exemptions as herein laid down, still the special act of September 20th, 1852, is not repealed by the act entitled " An act to provide for a uniform system of assessing and collecting taxes on railroads." Approved March 10th, 1871. A late statute which is general and affirmative does not repeal a former which is particular, unless negative words are used, or unless the two acts are irreconcilably inconsistent. (State *ex rel.* Vastine vs. Judge of St. Louis Probate Court, 38 Mo., 529, and authorities there cited ; N. Y. & Erie R. R. Co. vs. Sabine, 26 Pa. St. R., 244 ; City of St. Louis vs. Alexander, 23 Mo., 483.) There is nothing in the act of March 10, 1871, under which the appellant claims the right to tax the respondent, which repeals the act of September 20th, 1852, either by direct words or even by implication. (Sess. Acts, 1871, p. 56.)

There have been repeated decisions of this court, holding that the respondent is not taxable in any other way, or for any other tax than the one specified in the third section of the act of September 20th, 1852.

WAGNER, Judge, delivered the opinion of the court.

This was an action brought by the plaintiff for the purpose of recovering a balance of State taxes assessed for the year 1872, against the defendant.

The defendant appeared and demurred to the petition upon the ground that the company was not liable for the taxes because they had been illegally assessed. This demurrer was sustained by the court and a final judgment was rendered thereon and the plaintiff appealed.

It appears that this controversy grows out of an assessment made for the year 1872 by the special board of equalization on the defendant's road and other property. That board adjusted and equalized defendant's taxable property and placed a valuation on the same of six millions, eight hundred and ten thousand, eight hundred and sixty dollars which was duly certified to the auditor. On this amount the taxes found due were, to the state revenue fund, thirteen thousand, six hundred and twenty-one dollars and seventy-two cents; and to the state indebtedness fund, seventeen thousand and twenty-seven dollars and fourteen cents, making a total of $30,648. 86. Of this sum defendant paid $25,326.27, leaving a balance of $5,322.59 which is the amount sued for.

The ground now taken by the defendant is that the special board of equalization had no authority to make the assessment; that the charter of the company points out the only mode by which taxes could be assessed against it, and that, therefore, the action of the board was void.

The act to provide for a uniform system of assessing and collecting taxes on railroads, approved March 10, 1871 (Sess. Acts 1871, p. 56) enacts that all railroads now constructed, in course of construction, or which shall hereafter be constructed in this State, and all other property, real, personal or mixed, owned by any railroad company or corporation, shall be subject to taxation, etc. The second section declares that on or before the first day of February in each and every year, the president or other chief officer of every railroad company whose road is now or which shall hereafter become so far complete and in operation as to run locomotive engines, with freight or passenger cars thereon, shall furnish to the State auditor a statement duly subscribed and sworn to by said president or other chief officer, before some officer authorized to administer oaths, setting out in detail all the property of said company, including the road-bed, buildings, machinery, engines, cars, lands, workshops, depots, and all other property of whatsoever kind, with the location thereof and the actual value thereof in each county in cash. The 5th section con-

stitutes the State Auditor, State Treasurer and the Register of Lands a special board of equalization of railroad property, and gives them the same powers and authorizes them to discharge the same duties with reference to railroad property as the State Board of equalization with reference to all other property. Section six provides that the board shall meet at the office of the State Auditor on the first Monday in May in each and every year, and requires the auditor to lay before the board all returns which shall have been made in accordance with the provisions of the law. The seventh section regulates the manner of proceeding in the valuation, adjustment and equalization of the property. This was the law under which the board acted in making the assessment.

On September 20th, 1852, an act was passed to give the defendant the benefit of the donation of lands made by congress in the same year. This act was accepted by the defendant and in the third section is the following: "In consideration of the grants and privileges herein conferred upon said company, the said company shall, on the first Monday in December in each year after said road is completed, opened and in operation, and declares a dividend, pay into the treasury of the State a sum of money equal to the amount of the State tax on other real and personal property of like value for that year upon the actual value of the road-bed, buildings, machinery, engines, cars and other property of said company, which shall be as a consideration to the State for the execution of the trust reposed in the State by an act of congress of the United States, approved June 10, 1852, entitled 'an act granting the right of way,' etc., and for the purpose of ascertaining the value of the same it shall be the duty of the president of said company on the first day of February in each year after said road is completed, opened and put in operation, and declares a dividend, to furnish to the auditor of the State a statement under his oath, made before and certified by some officer authorized to administer oaths, of the actual value of the road-bed, buildings, machinery, engines, cars and other property of said company; and from said statement so fur-

nished the auditor shall charge said company with the amount
appearing to be due the State, according to the statement fur-
nished, as herein required, by the president of said company
*      *      *      *      *      Provided that if said company
shall fail, for the period of two years after said road shall be
completed and put in operation, to declare a dividend, then
said company shall no longer be exempt from the payment of
said sum in this section required to be paid into the State
treasury on the first Monday of December in each year, by
said company, nor from the forfeitures and penalties in this
section imposed."

That the period has arrived in which the money is due the
State is not disputed; but it is insisted that the mode pointed
out in the section just referred to, for making the return and
fixing the valuation amounts to a contract that no other steps
should be taken, or course pursued, and that the legislature
was incompetent to alter this contract or impair its force.

To support this position the case of the Hann. & St. Joe.
Railway vs. Shacklett, (30 Mo., 550) is cited and relied on
as a case in point and as determining the precise question in
favor of the defendant.     But this is an entire misapprehen-
sion.    No such point was raised or decided in that case.    The
county of Marion had proceeded under the general revenue
law to assess a State, county and asylum tax on all the prop-
erty of the defendant, real and personal, situated in that county.

The validity of this assessment was before the court and it
was held that it was illegal, that the charter exempted the
property of the company from county taxes, but that under
the act of Sept. 20, 1852, the property of the company was
subject to taxation in the manner provided for in the third
section of the last named act.    Napton, J., in delivering the
opinion said:    " At the expiration of two years from the com-
pletion of the Hann. & St. Joe. Railroad, the roadbed, ma
chinery and all the property of this company, employed in
the operations of the road, are expressly subjected to a tax,
the amount of which is to be regulated by the general revenue
law of this State, and the mode of its assessment and collec-

tion is specifically pointed out." With this language I concur entirely. Whilst that mode remained alone, and no other was in existence it constituted the sole and only manner the State possessed of collecting the taxes. But it is nowhere intimated that there was no authority for changing the procedure and adopting different regulations for the assessment and collection of the taxes.

The case of the Hann. & St. Jo. R. R. vs. Shacklett was followed in this court in the case of the State vs. Hann. & St. Jo. R. R. Co., (37 Mo., 265) upon a similar state of facts; but in neither case was the question now under consideration presented or decided.

This very question was recently before the Supreme Court of the United States in the case of Bailey vs. The Pacific Railroad (not yet reported). The same claim was made by the company there that is contended for here.

The act in relation to the Pacific road contains this provision: "The said Pacific Railroad and the said Southwestern Branch Railroad shall be exempt from taxation respectively until the same shall be completed, opened and in operation, and shall declare a dividend, when the road-bed, buildings, machinery, engines, cars and other property of such completed road, at the actual cash value thereof, shall be subject to taxation at the rate assessed by the State on either real or personal property of like value; and for the purpose of ascertaining the value of the same, it shall be the duty of the president of said company on the first day of February in each year after such road is completed, opened and put in operation, and declares a dividend, to furnish the auditor of the State, a statement under his oath, made before and certified by some officer authorized to administer oaths, of the actual value of the road-bed, buildings, machinery, engines, cars and other property appertaining to said completed road; and from said statement so furnished the auditor shall charge said company with the amount appearing to be due to the State, according to the statement furnished, as herein required, by the president of the company. * * * Provided, that

if the said company shall fail, for the period of two years after said roads respectively shall be completed and put in operation, to declare a dividend, then said company shall no longer be exempt from the payment of said tax, nor from the forfeitures and penalties in this section imposed."

In answer to the argument that this was a contract, and that the State was precluded from resorting to any other mode of assessing and collecting the taxes, than that provided for in the above section, the Supreme Court say: "It is claimed, however, that even if this be so, the State is inhibited from altering the special provision on the subject of State taxation. This provision prescribes a mode for ascertaining the tax due the State. The president of the company is required to furnish to the auditor a statement, under oath, of the actual cash value of the property to be taxed, on which the company is directed to pay the tax due the State, within a certain time to the treasurer, under penalties. And the claim is that the State Legislature is prohibited from passing any law to assess the property of the company for taxation for State purposes in a different manner. It is not so written in the statute; nor, indeed, can any proper inference be drawn from what is written that the legislature intended to contract with the corporation in this particular. It would be strange, indeed, if it were so; for the mode of assessment might not work well, and yet if it formed the subject of a contract, it could not be changed. This value was the basis of taxation, and it could not be a matter of moment how it was fixed, provided it was done correctly. In this result both the State and the corporation had an equal interest. Both were interested in the means adopted only so far as they were efficient to secure the contemplated object. The exigency of the State required the revenue on the basis of actual value, and this, it is to be presumed, the corporation was willing to accord. At any rate it was the duty of the State, in justice to other property owners, to use the appropriate means to ascertain this value. The ordinary method of doing this is by the instrumentality of officers appointed for the

purpose; but the State asked the railroad, through its president, to make the valuation, to which the corporation assented. This way of reaching the result was less expensive to the State, but more expensive to the corporation, than the usual mode in which taxes are assessed. The president of the company could not make a true valuation without the expenditure of time and labor, and this repeated year by year, as values of property continually fluctuate. There is no presumption that he would not do it, conscientiously, according to his best judgment, but still it was a favor to the State for him to do it at all, and certainly no one can contend that a State cannot waive at any time a provision for its own benefit. Apart from this view of the subject, the provision in question was simply a mode for ascertaining the true value of the property to be taxed ; and, if, on the trial, it should turn out not to be the best mode for the purpose, surely the legislature has the right to change it and adopt another. This no one will question, unless the legislature has surrendered its power over the subject by contract, which, in our opinion, has not been done in this case."

This language is clear and emphatic, and as a correct exposition of the statute ought to be regarded as conclusive. In the mode pointed out for the assessment and collection of the taxes on defendant's property there are none of the characteristics of a contract. It is a simple regulation by which the result may be ascertained and arrived at ; but there is nothing to inhibit the adoption or substitution of any other, if it should be deemed advisable or advantageous. The rights of the company are in nowise interfered with. The actual valuation of the property is the primary object sought to be attained, and the only question is, how that shall most surely be accomplished.

All that the law attempts is to create a board which will equalize all property and place the actual value upon it. This is carrying out the requirement of the constitution, and is fair to the company and fair to the State. If any injustice is attempted by the board, the law affords ample remedy by

which their action can be reviewed and any wrong corrected But there is no allegation of that kind in the case. The institution of the board was legal and their assessment was authorized. The State having adopted in part a different mode from that contained in the act of 1852, and this being, in some respects, wholly inconsistent with that act, the latter mode, so far as the inconsistency goes, must prevail.

The judgment therefore should be reversed and the cause remanded; the other judges concur.